# In the United States Court of Federal Claims

No. 11-181 C

(E-Filed Under Seal:  May 31, 2011)[1]
(E-Filed with Redactions:  June 13, 2011)

| | |
|---|---|
| _____ ) | |
| ) | |
| NORTHEAST MILITARY SALES, INC., ) | |
| ) | Bid Protest; Cross-Motions for |
| Plaintiff, ) | Judgment on the Administrative |
| ) | Record |
| v. ) | |
| ) | |
| THE UNITED STATES, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |
| ) | |
| _____ ) | |

Ira E. Hoffman, Potomac, MD, for plaintiff; Jerry A. Miles, Potomac, MD, of counsel.

Lauren A. Weeman, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, United States Department of Justice, Washington, DC, for defendant; Helen J.S. White, Assistant General Counsel for the Defense Commissary Agency, Fort Lee, VA, of counsel.

## OPINION AND ORDER

---

[1]This Opinion was filed under seal on May 31, 2011, Docket Number (Dkt. No.) 74.  The court instructed the parties to file any requests for the redaction of protected material on or before Friday, June 10, 2011 at 12:00 noon Eastern Daylight Time.  In response to the court's directive of May 31, 2011, the parties filed a joint motion to redact.  Joint Mot. to Redact Competition Sensitive and/or Proprietary Information (Motion), Dkt. No. 76, filed June 10, 2011.  The Motion is GRANTED.

This is a post-award bid protest brought by Northeast Military Sales, Inc., (Northeast, NEMS or plaintiff), a bidder in Solicitation No. HDEC02-10-R-0005 (Solicitation, Request for Proposals or RFP) issued by the United States government acting through the Defense Commissary Agency (DeCA, the agency, the government or defendant).  First Am. Compl. for Injunctive Relief, a Declaratory J. and Damages (plaintiff's Complaint or Compl.), Docket Number (Dkt. No.) 42, filed April 21, 2011, at 1.  Plaintiff challenges defendant's decision to award Contract No. HDEC02-10-D-0008 (the Contract) to Nayyar Sons Corporation (Nayyar Sons or Nayyarsons).  Compl. 1.

Before the court are plaintiff's Complaint; Plaintiff's Motion for Preliminary and Permanent Injunctive Relief, Dkt. No. 5, filed March 22, 2011; Plaintiff's Revised Motion for Judgment on the Administrative Record (Pl.'s Revised Mot.), Dkt. No. 41, filed April 21, 2011; Defendant's Revised Cross-Motion for Judgment Upon the Administrative Record and Response to Plaintiff's Revised Motion for Judgment Upon the Administrative Record (Def.'s Resp.), Dkt. No. 48, filed April 26, 2011; Plaintiff's Revised Motion for Judgment on the Administrative Record (Pl.'s Mot. or plaintiff's Motion), Dkt. No. 60, filed May 9, 2011;[2] Plaintiff's Reply to Defendant's Response to Plaintiff's Revised Motion for Judgment on the Administrative Record and Response to Defendant's Revised Cross-Motion for Judgment on the Administrative Record (Pl.'s Reply or plaintiff's Reply), Dkt. No. 57, filed May 9, 2011; and Defendant's Reply to Plaintiff's Response to Defendant's Revised Cross-Motion for Judgment Upon the Administrative Record (Def.'s Reply), Dkt. No. 68, filed May 11, 2011.

The court held oral argument at the National Courts Building on Thursday, May 12, 2011 at 10:00 a.m. Eastern Daylight Time.[3]

Plaintiff contends that the "evaluation conducted by Defendant . . . was arbitrary, capricious, and inconsistent with applicable law and the solicitation; and the evaluation was so fundamentally flawed that the combined impact of the errors encountered here clearly prejudiced Plaintiff."  Pl.'s Reply 1 (quotations omitted).  Plaintiff requests an order

---

[2]The court ordered plaintiff to file a second revised motion for judgment on the administrative record because Plaintiff's Revised Motion for Judgment on the Administrative Record (plaintiff's Revised Motion or Pl.'s Revised Mot.), Docket Number, (Dkt. No.) 41, filed April 21, 2011, included a number of citations containing the abbreviation PL or SAR, and plaintiff did not explain what PL and SAR stand for.  See Op. and Order of May 5, 2011, Dkt. No. 53, at 4.

[3]The oral argument held on Thursday, May 12, 2011 was recorded by the court's Electronic Digital Recording (EDR) system.  The times noted in citations to the oral argument refer to the EDR record of the oral argument.

"permanently enjoining DeCA from awarding Nayyarsons any contract or task order" under RFP No. HDEC02-10-R-0005.  Pl.'s Mot. 27.

Defendant contends that DeCA "rationally evaluated the proposals submitted by NEMS and the awardee, [Nayyarsons], and determined, based upon a consistent and reasonable consideration of all evaluation criteria, that the proposal submitted by Nayyarsons presented the best value to the Government."  Def.'s Resp. 1-2.  The court agrees with defendant:  the award is not arbitrary, capricious or not in accordance with law.

I.     Background

       A.     The Solicitation and Initial Evaluation

The Solicitation provided for the award of "Commissary delicatessen and bakery resale operations in the Great Lakes Cluster of the East Region for Great Lakes NS, IL; Selfridge ANGB, MI; Harrison Village, IN; Wright-Paterson AFB, OH; Fort Knox and Fort Campbell, KY" for a term of two years with two one-year option periods and four one-year award term periods.  Administrative Record (AR) Tab 2, at 17, 27.  Offerors were informed that "[t]he successful contractor to receive the contract award will be determined using the best value, trade-off method":

       The Government will award one or more contracts resulting from this
       solicitation to the responsible offeror/offerors whose offer represents the best
       value after evaluation in accordance with the factors and sub-factors in the
       solicitation.

AR Tab 2, at 28.

The Solicitation provides that the following factors and sub-factors will be used to evaluate offerors:

       I.     Technical Capability
              a.     Customer Satisfaction
              b.     Increase Sales
              c.     Continue Customer Savings
              d.     Quality Assurance Program
              e.     Transition Approach

       II.    Past Performance

3

        a.       Quality History/Overall Customer Satisfaction
        b.       Business Relations

III.    Price

AR Tab 2, at 28.

      The Evaluation Plan provides that Customer Satisfaction, Increase Sales, Continue Customer Savings and Quality Assurance Program will be evaluated on a twenty-five-point scale; Quality History/Overall Customer Satisfaction and Business Relations will be evaluated on a twenty-point scale; and Transition Approach will be evaluated on a ten-point scale.  AR Tab 1, at 1.  The Evaluation Plan provides that point ratings correspond to adjectival ratings as follows:

10 Point Scale:

| | |
|---|---|
| Unsatisfactory | (0 points) |
| Marginal | (1-3 points) |
| Satisfactory | (4-6 points) |
| Very Good | (7-8 points) |
| Exceptional | (9-10 points) |

20 Point Scale:

| | |
|---|---|
| Unsatisfactory | (0 points) |
| Marginal | (1-7 points) |
| Satisfactory | (8-14 points) |
| Very Good | (15-18 points) |
| Exceptional | (19-20 points) |

25 Point Scale:

| | |
|---|---|
| Unsatisfactory | (0 points) |
| Marginal | (1-10 points) |
| Satisfactory | (11-19 points) |
| Very Good | (20-23 points) |
| Exceptional | (24-25 points) |

AR Tab 1, at 3-5.

Of the evaluation factors, Technical Capability "is significantly more important than 'Past Performance.'" AR Tab 2, at 28. "[T]echnical Capability and Past Performance, when combined, are considered to be significantly more important than Price (percentage of patron savings)." AR Tab 2, at 29. In addition, "the Government reserves the right to award to other than the offeror with the most favorable price or the offeror with the highest ranked technical or past performance rating." AR Tab 2, at 28.

The Technical Capability sub-factors, Customer Satisfaction, Increase Sales, Continue Customer Savings and Quality Assurance Program are "equally important, and significantly more important than 'Transition Approach.'" AR Tab 2, at 28-29. The Past Performance sub-factor Quality History/Overall Customer Satisfaction "is equal to 'Business Relations.'" AR Tab 2, at 29.

With regard to the Technical Capability sub-factor, Customer Satisfaction, the Solicitation provides that offerors "shall identify a methodology they will employ for measuring customer satisfaction, adjusting/refining levels of service and product mix to achieve the satisfaction objectives, and promoting awareness of the benefits of the managed services." AR Tab 2, at 27. In addition, offerors "shall identify metrics to be employed in monitoring and measuring customer satisfaction," "techniques and any additional tools necessary to support the managed services to promote customer satisfaction" and "any procedures and/or additional tools required to support the in-store deli/bakery services in promoting customer satisfaction." AR Tab 2, at 27.

With regard to the Technical Capability sub-factor, Increase Sales, the offeror is to describe its "principles, practices, and procedures for increasing sales, to include marketing and merchandising strategies," and "provide a proposed percentage of overall deli and bakery (combined) operation sales increases per individual store for each performance period." AR Tab 2, at 27. The Solicitation further provides:

> These percentages of sales increases will be calculated using the previous year's deli and bakery (combined) operation sales as a base . . . . Your proposed percentage of sales increases will be incorporated into the resultant contract and will be applicable to the performance periods as indicated. Your ability to meet or exceed these projected percentages will become a part of the consideration in making Award Term decisions.

AR Tab 2, at 27.

Offerors were also required to describe their "long-term approach to providing continued customer savings," "outline [their] quality assurance process" and "explain [their] plan for assuming control of the managed services."  AR Tab 2, at 27-28.

"Past Performance may be evaluated based on the offeror's relationship and performance history with their customers and suppliers."  AR Tab 2, at 29.  The Solicitation provides that the Contracting Officer (CO) shall evaluate a number of documents to determine an offeror's Past Performance:

> In evaluating past performance, the Government will use the references provided by the offeror and other sources of information, including, but not limited to:  federal, state and local Government agencies, better business bureaus, published media, and electronic databases.  The Government will also consider all in-house information available, such as, but not limited to, the offeror Performance Evaluations (DeCA Form 10-17), past performance surveys, emails and correspondence on file regarding an offeror's performance on current DeCA contracts.

AR Tab 2, at 29.

The Solicitation provides that the "[c]ontractor is to submit their proposal price as a percentage of patron savings" on "core items,"[4] AR Tab 2, at 17, and "[t]he Government will evaluate an offeror's proposed percentage of savings for price realism in relation to the total requirements of the solicitation and the offeror's technical proposal," AR Tab 2, at 29.  The Solicitation does not describe the methodology required to conduct the price realism analysis.  See AR Tab 2, at 29.

The Evaluation Plan provides that a technical evaluation team (TET) "will evaluate each technical proposal solely on the evaluation factors specified."  AR Tab 1, at 2.  The TET will arrive at a consensus rating, and "[o]nce the consensus rating is completed and accepted by the Contracting Officer, it will become the official rating of record."  AR Tab 1, at 2.  The Evaluation further provides that:

> Upon completion of the evaluation process, the evaluation results will be provided to the Contracting Officer.  The Contracting Officer will evaluate prices to determine

---

[4] The "core items" are:  Honey Ham, Virginia Ham, Roast Beef, Smoked Turkey Breast, Mesquite Turkey Breast, Roasted Turkey Breast, Salami (Cotto), Provolone Cheese, Swiss Cheese, and American Cheese.  Administrative Record (AR) Tab 2, at 17.

reasonableness.  Award will be made to the offeror whose proposal contains the combination of those criteria offering the best value to the Government.  This will be determined by comparing differences in the value of the technical approach and performance history with the differences in price.

AR Tab 1, at 2.

The TET evaluated proposals during July and August 2010.  Def.'s Notice in Resp. to the Court's Order Dated May 5, 2011 (Def.'s Notice), Dkt. No. 59, at 2 (citing AR Tab 11, at 2637, 2645).  The TET rated Northeast and Nayyarsons as follows:

| Technical Capability | Maximum Points | Nayyarsons | Northeast |
|---|---|---|---|
| Customer Satisfaction | 25 | 24 (Exceptional) | 23 (Very Good) |
| Increase Sales | 25 | 23 (Very Good) | 23 (Very Good) |
| Continue Customer Savings | 25 | 23 (Very Good) | 23 (Very Good) |
| Quality Assurance Program | 25 | 25 (Exceptional) | 21 (Very Good) |
| Transition Approach | 10 | 9 (Exceptional) | 8 (Very Good) |
| Subtotal: | 110 | 104 | 98 |
| Past Performance | | | |
| Quality History/Overall Customer Satisfaction | 20 | 19 (Exceptional) | 19 (Exceptional) |
| Business Relations | 20 | 19 (Exceptional) | 19 (Exceptional) |
| Subtotal: | 40 | 38 | 38 |
| Total: | 150 | 142 | 136 |

AR Tab 11, at 2649.

7

The CO determined that Nayyarsons's proposal would be more advantageous to DeCA:

> When evaluated against the stated criteria, the Contracting Officer's independent judgment of all documents resulted in the determination that the Nayyar Sons' overall technical capability and past performance is superior to that of NEMS.  Nayyar Sons proposal also offers a greater value to the commissary patrons in the amount of approximately [***] over the life of the contract.  The performance risk to the Government associated with Nayyar Sons is low.  As such, Nayyar Sons' offer is determined to be more advantageous to the Government, considering technical capability, past performance, and price.

AR Tab 11, at 2653.  On September 30, 2010 DeCA awarded the contract to Nayyarsons.  AR Tab 11, at 2658.6.

B.      The GAO Protest and Re-evaluation

On October 6, 2010 Northeast filed a bid protest with the Government Accountability Office (GAO) challenging the award.  AR Tab 13, at 2675.  On January 13, 2011 GAO determined that DeCA's evaluation of Nayyarsons's Past Performance was unreasonable because DeCA did not consider negative past performance information contained in internal emails.  AR Tab 17, at 2716, 2721.  GAO recommended "that the agency reevaluate Nayyarsons' past performance consistent with our decision and make a new source selection determination."  AR Tab 17, at 2723.

In January 2011 the TET met to re-evaluate the Past Performance of Nayyarsons and Northeast.  AR Tab 22, at 2787.  The TET considered the internal emails that it failed to consider during the initial evaluation.  See AR Tab 22, at 2786-92.  However, other than those internal emails, the TET considered only the Past Performance information that was considered by the TET during the initial evaluation conducted between July 26 and August 23, 2010.  Def.'s Notice 2.  The TET rated Northeast and Nayyarsons as follows:

| Technical Capability | Maximum Points | Nayyarsons | Northeast |
|---|---|---|---|
| Customer Satisfaction | 25 | 24 (Exceptional) | 23 (Very Good) |
| Increase Sales | 25 | 23 (Very Good) | 23 (Very Good) |

8

| | | | |
|---|---|---|---|
| Continue Customer Savings | 25 | 23 (Very Good) | 23 (Very Good) |
| Quality Assurance Program | 25 | 25 (Exceptional) | 21 (Very Good) |
| Transition Approach | 10 | 9 (Exceptional) | 8 (Very Good) |
| Subtotal: | 110 | 104 | 98 |
| Past Performance | | | |
| Quality History/Overall Customer Satisfaction | 20 | 18 (Very Good) | 18 (Very Good) |
| Business Relations | 20 | 18 (Very Good) | 17 (Very Good) |
| Subtotal: | 40 | 36 | 35 |
| Total: | 150 | 140 | 133 |

AR Tab 22, at 2796.  In the re-evaluation, the TET lowered Nayyarsons's and Northeast's Quality History/Overall Customer Satisfaction and Business Relations ratings.  Compare AR Tab 11, at 2649, with AR Tab 22, at 2796.  "The change is a reflection of the review of the evaluation criteria by the Contracting Officer with the TET, and the TET's subsequent re-examination and documentation of the past performance information on each offeror."  AR Tab 22, at 2795.  The CO determined that "Nayyar Sons provides the overall best value to the Government," AR Tab 22, at 2806, and DeCA re-awarded the contract to Nayyarsons, AR Tab 25, at 2831.  On March 22, 2011 Northeast filed a complaint in this court seeking to enjoin DeCA's award to Nayyarsons.  Compl. ¶ 105.

II.     Legal Standards

        A.      Bid Protest Standard of Review

        The Tucker Act, as amended by the Administrative Dispute Resolution Act (ADRA), 28 U.S.C. § 1491(b)(1) (2006), confers jurisdiction on this court:

        to render judgment on an action by an interested party objecting to a solicitation
        by a Federal agency for bids or proposals for a proposed contract or to a

proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1).  The court may "entertain such an action without regard to whether suit is instituted before or after the contract is awarded."  Id.

"A bid protest proceeds in two steps."  Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law.  Id.  The second step is to determine whether the error was prejudicial.  Id.

1.      The Plaintiff Must Establish Error

The court reviews a bid protest action under the standards set out in the Administrative Procedure Act (APA), 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4); NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004).  The APA provides that an agency's decision is to be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); see Bannum, 404 F.3d at 1351; Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir. 2004); Impresa Construzioni Geom. Domenico Garufi v. United States (Impresa), 238 F.3d 1324, 1332 (Fed. Cir. 2001); Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057 (Fed. Cir. 2000).

Under the arbitrary or capricious standard of review, an agency's decision must be sustained if it has a rational basis.  Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co. (State Farm), 463 U.S. 29, 43 (1983).  "The arbitrary and capricious standard applicable here is highly deferential.  This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."  Advanced Data Concepts, 216 F.3d at 1058 (citing Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)).  In particular, the reviewing court may not substitute its judgment for that of the agency.  State Farm, 463 U.S. at 43.  The question for the court is not whether the agency is correct or whether the court would have reached the same conclusion as the agency, but whether there was a reasonable basis for the agency's actions.  Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))).

10

Under the APA standard of review, as applied in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and now under the ADRA, "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa, 238 F.3d at 1332. Challenges to decisions on the basis of a violation of a regulation or procedure "must show a clear and prejudicial violation of applicable statutes or regulations." Id. at 1333 (internal quotation and citation omitted).

A court reviewing an agency action in a best value procurement must be highly deferential, and the agency that made the determination in question is presumed to have acted in a reasonable and rational manner. Advanced Data Concepts, 216 F.3d at 1057-58; Fort Carson Support Servs. v. United States (Fort Carson), 71 Fed. Cl. 571, 586 (2006). A plaintiff must rebut the presumption of a rational basis in order to upset the agency's findings. See L-3 Commc'ns EOTech, Inc. v. United States, (L-3 Commc'ns), 87 Fed. Cl. 656, 664 (2009); see also Advanced Data Concepts, 216 F.3d at 1058 (The arbitrary and capricious "standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."). In other words, "[m]ere disagreement with an agency's handling of a procurement matter falls short of meeting the burden of proving that the process was arbitrary and capricious." Blackwater Lodge & Training Ctr., Inc. v. United States (Blackwater), 86 Fed. Cl. 488, 514 (2009) (citations omitted). Moreover, a plaintiff's burden is "elevated where the solicitation contemplates award on a 'best value' basis." Id. at 503 (citing Galen, 369 F.3d at 1330). In determining whether an agency acted rationally, the court is particularly deferential to the agency's technical evaluation. L-3 Commc'ns, 87 Fed. Cl. at 664. "In particular, the evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." Fort Carson, 71 Fed. Cl. at 586 (citations omitted).

"Contracting officers are not obligated by the APA to provide written explanations for their actions." Impresa, 238 F.3d at 1337. Moreover, agency actions are entitled to a presumption of "regularity." Id. at 1338 (citations omitted). There is a "strong presumption that government officials act correctly, honestly, and in good faith when considering bids." Savantage Fin. Servs., Inc. v. United States (Savantage), 86 Fed. Cl. 700, 703-04 (2009) (citations omitted), aff'd, 595 F.3d 1282 (Fed. Cir. 2010).

2.      The Plaintiff Must Establish Prejudice

In order to prevail in a bid protest, the plaintiff must demonstrate both that an error occurred and that such error was prejudicial. Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562

(Fed. Cir. 1996) (citations omitted); see <u>Alfa Laval Separation, Inc. v. United States</u> (<u>Alfa Laval</u>), 175 F.3d 1365, 1367 (Fed. Cir. 1999).  If the court finds that there is no error, there is no prejudice and the government's decisions must be left undisturbed.  <u>Alfa Laval</u>, 175 F.3d at 1367.  Furthermore, "non-prejudicial errors in a bid process do not automatically invalidate a procurement."  <u>Labatt Food Serv. v. United States</u>, 577 F.3d 1375, 1380 (Fed. Cir. 2009) (internal citations omitted).  In the context of a post-award bid protest, "the plaintiff must demonstrate 'substantial prejudice' by showing that there was a 'substantial chance' it would have been awarded the contract but for the agency's error."  <u>Weeks Marine, Inc. v. United States</u>, 79 Fed. Cl. 22, 35 (2007) (citing <u>Bannum</u>, 404 F.3d at 1353), <u>aff'd in relevant part</u>, 575 F.3d 1352 (Fed. Cir. 2009).

B.      Motions for Judgment on the Administrative Record

Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC) provides for judgment on the administrative record "[w]hen proceedings before an agency are relevant to a decision in a case" before the court.  RCFC 52.1(a).  RCFC 52.1 does not address the standards and criteria to be applied in cases decided pursuant to RCFC 52.1 because "[t]he standards and criteria governing the court's review of agency decisions vary depending upon the specific law to be applied in particular cases."  RCFC 52.1 Rules Committee Note (2006).  Accordingly, the standards of review and burdens of proof and persuasion are set by the terms of the applicable substantive law, discussed above in Part II.A.

C.      Standard for Permanent Injunctive Relief

In the bid protest context, the Tucker Act permits the court to "award any relief that the court considers proper, including . . . injunctive relief."  28 U.S.C. § 1491(b)(2).  "'Establishing legal and prejudicial error does not automatically translate into injunctive relief.'"  <u>IDEA Int'l, Inc. v. United States</u>, 74 Fed. Cl. 129, 137 (2006) (quoting <u>Cubic Defense Sys., Inc. v. United States</u>, 45 Fed. Cl. 450, 473 (1999)).  To obtain a permanent injunction, a plaintiff must succeed on the merits and show by a preponderance of the evidence:  "(1) that it will suffer irreparable harm if injunctive relief is not awarded; (2) that granting the relief serves the public interest; and (3) that the harm to be suffered by it outweighs the harm to the Government and third parties."  <u>United Int'l Investigative Servs., Inc. v. United States</u>, 41 Fed. Cl. 312, 323 (1998) (citing <u>FMC Corp. v. United States</u>, 3 F.3d 424, 427 (Fed. Cir. 1993)); see <u>Acumed LLC v. Stryker Corp.</u>, 551 F.3d 1323, 1327 (Fed. Cir. 2008); <u>IDEA Int'l</u>, 74 Fed. Cl. at 137.

III.    Discussion

A.     Technical Capability

1.     Customer Satisfaction

The Solicitation provides that "[t]he offeror shall identify a methodology they will employ for measuring customer satisfaction" and the "metrics to be employed in monitoring and measuring customer satisfaction."  AR Tab 2, at 27.

NEMS argues that it provided [***], Pl.'s Mot. 10 (citing AR Tab 4, at 178-79), and that its proposal [***], Pl.'s Mot. 10 (citing AR Tab 4, 176-77).  Plaintiff contends that the evaluation score sheets do not mention [***].  Pl.'s Mot. 10 (citing AR Tab 7, at 421; AR Tab 11, at 2646-47).  Plaintiff contends, without citation to the AR, that Nayyarsons did not provide "metrics," Pl.'s Mot. 10, but that the evaluators nevertheless assigned Nayyarsons an "Exceptional" rating for using comment cards and sales data, Pl.'s Mot. 10 (citing AR Tab 11, at 2649).  Based on the foregoing, plaintiff argues:

> Since Nayyarsons did not meet the requirements for an "Exceptional" rating for
> Customer Satisfaction, and since NEMS was not given credit for [***], while
> [Nayyarsons] was accorded more evaluation points for [***], the improperly
> uneven evaluation of Customer Satisfaction prejudiced NEMS.  Even assuming,
> arguendo, that the proposals were comparable, Nayyarsons was rewarded
> generously, NEMS was not.  Such an inconsistent evaluation is
> "quintessentially arbitrary, capricious and unfair."

Pl.'s Mot. 10 (quoting Ashbritt, Inc. v. United States, 87 Fed. Cl. 344, 367 (2009)).  In Ashbritt, the court stated that "where an evaluation scores two virtually identical proposals differently, such an inconsistent evaluation is quintessentially arbitrary, capricious and unfair." Ashbritt, 87 Fed. Cl. at 367.  There is no basis on which the court can conclude that Nayyarsons and NEMS submitted "two virtually identical proposals."  See id.  Therefore, it was not "quintessentially arbitrary, capricious and unfair" for the TET to assign Nayyarsons an "Exceptional" rating and NEMS a "Very Good" rating.  See id.

Defendant argues that "DeCA's decision to rate Nayyarsons's customer service capability 'exceptional' is well-documented and was based upon its reasoned consideration of how well Nayyarsons's overall proposal" met the requirements of the Solicitation; therefore, defendant argues that "DeCA's rating decision of this technical sub-factor is . . . entitled to deference and should be upheld."  Def.'s Resp. 28.

The TET stated that "[Nayyarsons] uses three major points for customer satisfaction."

AR Tab 7, at 485.  First, [***].  AR Tab 7, at 485.  Second, [***].  AR Tab 7, at 485.  Third, [***].  AR Tab 7, at 485.  In addition, the TET stated that [***] to keep customers informed of good deals at the Deli/Bakery."  AR Tab 7, at 485.  With respect to adjusting levels of service and product mix, the TET observed that Nayyarsons has "a very interesting process to fix all the issues brought up, [***].  AR Tab 7, at 486.  The TET assigned Nayyarsons an "Exceptional" rating.  AR Tab 11, at 2649.

DeCA's documented award decision was based on its articulated and apparently rational determination of how well Nayyarsons's proposal met the requirements of the Solicitation and is, therefore, entitled to deference.  See Advanced Data Concepts, 216 F.3d at 1057-58 (stating that a court reviewing an agency action in a best value procurement must be highly deferential, and the agency that made the determination in question is presumed to have acted in a reasonable and rational manner).  The court will not "substitute its judgment for that of the agency."  State Farm, 463 U.S. at 43.  DeCA was not required, as plaintiff contends, to mention [***] on the evaluation score sheets.  Pl.'s Mot. 10; see Impresa, 238 F.3d at 1337 ("Contracting officers are not obligated by the APA to provide written explanations for their actions.").

2.    Increase Sales

In its Motion, plaintiff made several arguments regarding the Increase Sales sub-factor.  See Pl.'s Mot. 10-13.  In particular, plaintiff contends that DeCA "did not even bother to quantify how many times Nayyarsons met its proposed increase sales."  Pl.'s Mot. 13 (citing AR Tab 22, at 2802-03).  Plaintiff's argument demonstrates plaintiff's confusion about the requirements of the Solicitation relating to Past Performance and Technical Capability.  See Pl.'s Mot. 10-13.[5]  Increase Sales was also evaluated as a Past Performance sub-factor.  See AR Tab 22, at 2793.  As a Technical Capability sub-factor, Increase Sales is "evaluated based on what the contractor says he is going to do that will help him accomplish the projected sales increases."  AR Tab 22, at 2793.  "The determination as to whether a contractor has accomplished projected sales increases is measured and evaluated as past performance."  AR Tab 22, at 2793.

---

[5]Increase Sales was also evaluated as a Past Performance sub-factor.  See AR Tab 22, at 2793.  As a Technical Capability sub-factor, Increase Sales is "evaluated based on what the contractor says he is going to do that will help him accomplish the projected sales increases."  AR Tab 22, at 2793.  "The determination as to whether a contractor has accomplished projected sales increases is measured and evaluated as past performance."  AR Tab 22, at 2793.

14

Plaintiff's arguments regarding the Technical Capability sub-factor Increase Sales are based on plaintiff's assumption that the CO was required to verify the Increase Sales proposed by the offerors as part of her Technical Capability evaluation. See Pl.'s Mot. 11-12. However, the Solicitation does not require the CO to verify the Increase Sales proposed by the offerors. See AR Tab 2, at 27. Importantly, plaintiff's argument regarding the CO's failure to verify proposed Increase Sales, is supported in its motion only by citation to the GAO Hearing Transcript. See Pl.'s Mot. 11-12. However, the GAO Hearing Transcript contains post-award statements by the CO explaining how the CO arrived at her award decision. See AR Tab 26, at 2839-42. The court advised the parties in its Opinion and Order of May 5, 2011, Dkt. No. 53, that the GAO Hearing Transcript is not available as a basis for decision by this court under Axiom Res. Mgmt., Inc. v. United States (Axiom), 564 F.3d 1374 (Fed. Cir. 2009) notwithstanding that it is part of the GAO protest record, see RCFC Appendix C ¶ 22(u) (stating that the "core documents relevant to a protest may include . . . the record of any previous administrative or judicial proceedings relating to the procurement, including the record of any other protest of the procurement"). Plaintiff also contends that:

> To be specific, the evaluators were apparently impressed with the fact that Nayyarsons uses "data from their demographic studies." But there is no evidence whatsoever that Nayyarsons uses any "demographic studies," let alone "their" studies.

Pl.'s Mot. 11 (quoting AR Tab 7, at 480, 486). Nothing in the Administrative Record suggests that Nayyarsons did not use "data from their demographic studies."

In its Reply, plaintiff did not argue that DeCA failed to evaluate the Increase Sales sub-factor rationally. See Pl.'s Reply 12. Because plaintiff's arguments regarding the Increase Sales Technical Capability sub-factor are supported only by the GAO Hearing Transcript, and are based on the assumption that the CO was required to verify the Increase Sales of the offerors, plaintiff has failed to rebut the presumption of a rational basis afforded to the agency's findings.

3.    Continue Customer Savings

Plaintiff relies only on reports documenting Nayyarsons's past performance on existing commissary contracts to support its argument that DeCA's evaluation of the Technical Capability sub-factor Continue Customer Savings was arbitrary because "Nayyarsons charged commissary patrons more than they would have had to pay at nearby commercial supermarkets for the same items." Pl.'s Mot. 13 (emphasis omitted); see Pl.'s Reply 12-13; Pl.'s Reply 12 n.12. However, plaintiff's contention addresses Past Performance, rather than

Technical Capability.  See AR Tab 2, at 27, 29.  As part of the Technical Capability evaluation, the Solicitation does not require that the CO determine whether, in the past, the offerors charged commissary patrons more than they would have had to pay for the same items at nearby stores.  See AR Tab 2, at 27.

      4.      Quality Assurance Program

      In the Technical Capability section of its Revised Motion, plaintiff states, without citation to the Administrative Record, that:

> Given that NEMS received "Exceptional" ratings for its quality assurance in its Award Term reviews, and given that DeCA ignored multiple reports of food safety violations by Nayyarsons, DeCA's evaluation of Quality Assurance was also fundamentally flawed to NEMS['] prejudice.

Pl.'s Mot. 13.

      Whether Nayyarsons committed food safety violations in the past is a factor to be considered in the Past Performance evaluation.  See AR Tab 2, at 28-29.  As part of the Technical Capability evaluation, the Solicitation does not require that the CO determine whether the offerors committed food safety violations in the past.  See AR Tab 2, at 28.

      5.      Transition Approach

      The Solicitation provides that offerors shall explain their plans "for assuming control of the managed services."  AR Tab 2, at 28.

      With respect to the Transition Plan sub-factor, plaintiff argues, without citation the Administrative Record, that:

> For this subfactor, DeCA evaluated NEMS for both [***] and [***] plans, but evaluated Nayyarsons [***].  In other words, DeCA treated the two offerors differently, to NEMS['] prejudice.

Pl.'s Mot. 13.

      Defendant responds that the "TET determined that Nayyarsons's transition approach was 'well laid out and explained to the satisfaction of the board.'"  Def.'s Resp. 32 (quoting AR Tab 7, at 484.  Additionally, defendant states that "the TET found that Nayyarsons had

provided a 'well defined 28 day process' for transitioning and that its transition scheduling chart was 'well done.'"  Def.'s Resp. 32 (quoting AR Tab 7, at 493).  Therefore, defendant contends, "DeCA's evaluation of Nayyarsons's transition approach, which is supported by the record and based upon a reasoned consideration of the evaluation criteria, should be upheld." Def.'s Resp. 32 (citation omitted).

Plaintiff's briefing on Transition Approach is unsupported by citation to any legal authority or to the Administrative Record.  Plaintiff has failed to rebut the presumption of a rational basis in order to upset the agency's findings on the Transition Approach sub-factor.

B.     Past Performance[6]

The Solicitation provides that "Past [P]erformance may be evaluated based on the offeror's relationship and performance history with their customers and suppliers."  AR Tab 2, at 29.  In addition, the Solicitation provides that the CO will evaluate a number of documents to determine an offeror's Past Performance:

> In evaluating past performance, the Government will use the references
> provided by the offeror and other sources of information, including, but not
> limited to:  federal, state and local Government agencies, better business
> bureaus, published media, and electronic databases.  The Government will also

---

[6]In its Motion, plaintiff states that documents attached to Plaintiff's Motion to Compel the Production of Documents to Supplement the Administrative Record (plaintiff's Motion to Compel), Dkt. No. 21, filed April 11, 2011 (the attachments), "were admitted" (that is, ordered to be included in) the Administrative Record by this court's Order of April 15, 2011, Dkt. No. 32. Pl.'s Mot. 4 n.1.

However, the court's Order of April 15, 2011, did not order the addition to the Administrative Record of the attachments.  Rather, the court's Order of April 15, 2011 granted plaintiff's Motion to the extent set forth in the Order of April 15, 2011 and ordered defendant to supplement the Administrative Record with certain items in existence at the time of the evaluation.  See Order of Apr. 15, 2011 passim.  In response to the court's Order of April 15, 2011, defendant supplemented the Administrative Record with AR Tabs 27-30.  See Def.'s Notice of Filing Supplemental Administrative Record, Dkt. No. 37, filed April 18, 2011.  The attachments to Plaintiff's Motion to Compel were not made part of the Administrative Record. The supplementation of the Administrative Record in accordance with the court's Order of April 15, 2011, is limited to AR Tabs 27-30 of the Administrative Record.  See Order of May 11, 2011, Dkt. No. 69, at 2.

> consider all in-house information available, such as, but not limited to, the
> offeror Performance Evaluations (DeCA Form 10-17), past performance
> surveys, emails and correspondence on file regarding an offeror's performance
> on current DeCA contracts.

AR Tab 2, at 29.  "The evaluation of past performance will be an assessment based on a
consideration of all relevant facts and circumstances."  AR Tab 2, at 29.  The focus of
plaintiff's challenge to defendant's evaluation of Past Performance is defendant's alleged
failure to consider the Core Items Price Surveys, Self Inspection Food Hazard Control
Checklists and IG Reports "despite the fact that the solicitation stated that the agency 'will'
consider 'all in-house information available' on current DeCA contracts and that the
evaluation of [P]ast [P]erformance will be based on 'consideration of all relevant facts.'"[7]
Pl.'s Reply 2-3 (quoting AR Tab 2, at 29).  According to plaintiff, those documents show that
the DeCA past performance evaluation was "arbitrary and capricious":

> Since those documents show that the awardee, Nayyarsons, had charged
> commissary patrons more for core items at multiple commissaries over a
> number of months, had inflated patron savings data, and had repeatedly failed to
> maintain food safety standards, Defendant's evaluation of Nayyarsons' past
> performance evaluation as "Very Good" and higher than that of NEMS, was
> arbitrary and capricious.

Pl.'s Reply 3 (emphasis omitted) (quoting AR Tab 22, at 2796).  At Oral Argument, plaintiff's
counsel further stated:

> The crux of our argument is that the agency failed to do its duty of
> evaluating proposals in accordance with the requirements under the RFP, in
> particular, Past Performance.  The RFP stated that Past Performance would be
> evaluated on the basis of a consideration of all relevant factors and that the
> agency . . . will consider . . . all in-house information . . . .  In this case, the
> agency did not consider the best information available that was all in-house as to
> the past performance of Nayyarsons. . . .  [T]he best information available is the
> Core Items Price Surveys . . . .

Oral Argument of May 12, 2011, Argument of Mr. Hoffman, 10:12:10-13:15.

---

[7]The Core Items Price Surveys, Self Inspection Food Hazard Control Checklists and
DeCA Inspector General Reports are found at the Supplemental Administrative Record (SAR),
Dkt. No. 37, filed by defendant on April 18, 2011.

The court must determine whether DeCA erred by failing to consider the Core Items Price Surveys, Self Inspection Food Hazard Control Checklists and IG Reports in light of the Solicitation's requirement that the government "consider all in-house information . . . on-file regarding an offeror's performance on current DeCA contracts."  AR Tab 2, at 29.

Defendant contends that it was not required by the Solicitation to rely on Core Items Price Surveys because those documents are generated at the store level and are not forwarded to the CO.  Def.'s Resp. 45.  Defendant further argues that even if the Core Items Price Surveys and Self Inspection Food Hazard Control Checklists do not reach the CO:

> any significant issues pertaining to Nayyarsons's or (NEMS's) performance on . . . existing DeCA contracts . . . would have been reflected in the store managers' responses to DeCA's past performance inquiry regarding Nayyarsons and/or directed to the Contracting Officer as they occurred.

Def.'s Resp. 45-46 (citing AR Tab 22, at 2791-92).  The Administrative Record contains a statement of the Contracting Officer expressly noting that "NEMS and Nayyar Sons both experienced periodic problems in their day-to-day operations" and that "each has encountered problems with personnel and sanitation."  AR Tab 22, at 2800.  The Administrative Record also contains the Contracting Officer's observation that day-to-day operating problems are "not unusual in these types of operations.'"  AR Tab 22, at 2800.  Based on the foregoing, defendant concludes that the "administrative record thus confirms that the contracting officer was aware of daily operational issues experienced by both offerors, and considered the same in making an award decision."  Def.'s Resp. 46.

The extent of the distribution within DeCA of the Core Items Price Surveys, DeCA Self Inspection Food Hazard Control Checklists and IG Reports (collectively, the store-level documents) is addressed in the Declaration of Phyllis A. McGowan (April 14, 2011) (April 14 McGowan Decl.), Dkt. No. 48-1, filed April 26, 2011.

The April 14 McGowan Declaration was prepared expressly for this litigation.  The court would not, without cause, consider a document prepared expressly for litigation under Axiom, 564 F.3d at 1379-81.  In Axiom, 564 F.3d at 1381, the United States Court of Appeals for the Federal Circuit held that the United States Court of Federal Claims abused its discretion because it did not first determine whether "supplementation of the record was necessary in order not 'to frustrate effective judicial review'" before allowing supplementation of the administrative record:

> The focus of judicial review of agency action remains the administrative record,

which should be supplemented only if the existing record is insufficient to
permit meaningful review consistent with the APA.  Faced with the request to
supplement the administrative record in this case, the Court of Federal Claims
should have determined whether supplementation of the record was necessary in
order not "to frustrate effective judicial review."

Axiom, 564 F.3d at 1381 (quoting Camp v. Pitts, 411 U.S. 138, 142-43 (1973)).  Where, as
here, the Solicitation indicates that the agency will consider "all in-house information
available . . . on file regarding an offeror's performance on current DeCA contracts," AR Tab
2, at 29, the court's consideration of the scope of the "in-house information available" to the
evaluators is aided by an explanation of how the agency generates and distributes information.
It is not be possible for the court to determine whether the Core Items Price Surveys, Self
Inspection Food Hazard Control Checklists or IG Reports were "on file" and "available"
during evaluation without knowing how and where DeCA generated the Core Items Price
Surveys, Self Inspection Food Hazard Control Checklists and IG Reports and how and where
the Core Items Price Surveys, Self Inspection Food Hazard Control Checklists and IG Reports
were distributed within DeCA.  Accordingly, supplementation of the record with the April 14
McGowan Declaration is necessary and appropriate "in order not to 'frustrate effective judicial
review.'"  Axiom, 564 F.3d at 1381 (quoting Camp, 411 U.S. at 142-43).[8]

_____

[8]Plaintiff filed a motion to strike a second declaration of the CO, Phyllis A. McGowan.
Pl.'s Mot. to Strike Second Decl. of Phyllis A. McGowan (plaintiff's Motion to Strike), Dkt. No.
50, filed April 28, 2011.  The declaration of Phyllis A. McGowan (April 26 McGowan
Declaration) contains the CO's post-award rationalizations of her award decision.  Because the
April 26 McGowan Declaration contains post-award rationalizations of the CO's award decision,
and because supplementation of the Administrative Record with the April 26 McGowan
Declaration is not necessary in order not "to frustrate effective judicial review," Axiom Res.
Mgmt., Inc. v. United States (Axiom), 564 F.3d 1374, 1381 (Fed. Cir. 2009) (quotations
omitted), the court does not rely on the April 26 McGowan Declaration.  Accordingly, plaintiff's
Motion to Strike as to the April 26 McGowan Declaration is GRANTED.

Defendant also filed Defendant's Motion to Strike Affidavit of Edwin J. Fedeli, II
(defendant's Motion to Strike), Dkt. No. 16.  The Affidavit of Edwin J. Fedeli, II (Fedeli
Affidavit) was created expressly for this litigation.  The Fedeli Affidavit addresses
communications between NEMS and DeCA.  The Fedeli Affidavit does not contain information
that the court requires to review effectively the agency's evaluation.  Because the Fedeli
Affidavit post-dates the award decision, was created for this litigation, and because
supplementation of the Administrative Record with the Fedeli Affidavit is not necessary in order
not "to frustrate effective judicial review," Axiom, 564 F.3d at 1381 (quotations omitted), the
continue...

20

The April 14 McGowan Declaration explains that the store-level documents are maintained at the store level. April 14 McGowan Decl. ¶¶ 2-4. The Core Items Price Surveys, DeCA Self Inspection Food Hazard Control Checklists and IG Reports are generally not provided to the Resale Contracting Division during the regular course of business unless issues arise that are not resolved at the store level, April 14 McGowan Decl. ¶¶ 2-4, supporting the view that such documents were not available "in-house" to the evaluators.

It appears, as defendant asserts in briefing, that none of the store-level documents was provided to the Contracting Officer in the regular course of business, and that the documents were therefore not "available" to the Resale Contracting Division during evaluation. The court finds that the documents on which plaintiff relies can reasonably be viewed as outside the scope of "in-house information available" because the documents were not forwarded from the store to the Contracting Officer.

Furthermore, the Administrative Record reflects an awareness by the Contracting Officer of "periodic problems in . . . day-to-day operations" experienced by both NEMS and Nayyarsons. AR Tab 22, at 2800. The Contracting Officer was not required to flyspeck store-level reports. There is no basis on which the court can conclude that defendant violated the terms of the Solicitation by ignoring "in-house information available." Nothing in the Administrative Record concerning the evaluations of Past Performance suggests that the evaluation was irrational, arbitrary or capricious.

C.      Price

The Solicitation provides that the "[c]ontractor is to submit their proposal price as a percentage of patron savings" on "core items," AR Tab 2, at 17, and that "[t]he Government will evaluate an offeror's proposed percentage of savings for price realism in relation to the total requirements of the solicitation and the offeror's technical proposal," AR Tab 2, at 29. The Solicitation does not describe the precise methodology required to conduct the price realism analysis. See AR Tab 2, at 29.

In addition, the Solicitation provides that:

the evaluated price will be determined as follows: Historical deli sales cited in the solicitation for the applicable cluster x 80% (80/20 rule) x offeror's

---

[8]...continue
court does not rely on it. Defendant's Motion to Strike as to the Fedeli Affidavit is GRANTED.

proposed percentage of savings for the given period = evaluated price for the given period.

AR Tab 2, at 29.  Attached to the Solicitation is a spreadsheet titled Attachment 3 (Revised).  AR Tab 3, at 104-06.  The spreadsheet (Historical Deli Sales Spreadsheet) provides the "Historical deli sales" referenced in the evaluated price formula.  See AR Tab 3, at 104-06.

Plaintiff argues that the "evaluated price" formula set forth in the Solicitation and the method or, rather, the lack of a method in the Solicitation for conducting the price realism analysis are irrational.  Pl.'s Reply 18-19; see generally Oral Argument of May 12, 2011, Argument of Mr. Hoffman, 11:28:20-33:28.  At Oral Argument, Mr. Hoffman stated that there are problems with defendant's price analysis:

> There are so many fundamental problems with [DeCA's price analysis] . . . .  [DeCA must use some objective criteria] but they never applied any rational objective criteria . . . .  [The price analysis is] totally divorced from the fundamental principal of patron savings.

Plaintiff's argument that the terms of the Solicitation are themselves irrational has been waived.  Plaintiff failed to object to those terms prior to the close of bidding.  Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.").

In addition, plaintiff argues that DeCA failed to calculate "evaluated price" in accordance with the Solicitation.  Pl.'s Reply 17-21; see generally Oral Argument of May 12, 2011, Argument of Mr. Hoffman, 11:42:40-43:20 (stating that "there is a different formula applied").  The court agrees.  Defendant's evaluation of plaintiff's and Nayyarsons's price proposals differed from the method described in the Solicitation.  A recalculation employing the method described in the Solicitation, rather than employing the method used by defendant and contained in the Administrative Record, results in a price analysis that is more favorable to plaintiff.  However, a recalculation using the method set out in the Solicitation, while it reduces somewhat the spread between plaintiff's and Nayyarsons's prices, would still result in Nayyarsons's price being more favorable to the government.  Accordingly, defendant's price evaluation did not prejudice plaintiff.

In the Decision Summary, the CO states that Nayyarsons offers a more favorable price than plaintiff based on the analysis documented in attached spreadsheets:

22

The evaluated price (percent of patron savings) offered by Nayyar Sons for the Great Lakes Cluster, is valued at an estimated [***] as compared to NEMS' estimated [***]. The difference of [***] makes Nayyar Sons' price [***] more favorable than NEMS' price. Spreadsheets [(Price Spreadsheet)] setting forth the percent of patron savings offered by both offerors and showing the dollar value calculations are attached.

AR Tab 11, at 2653.

As plaintiff did in its Reply, the court uses the section of the Price Spreadsheet on Northeast and Nayyarsons, see AR Tab 11, at 2658.3-.4, and the section of the Historical Deli Sales Spreadsheet from the Administrative Record on the Great Lakes Commissary, see AR Tab 3, at 104-05, to describe how the CO's "evaluated price" analysis was conducted and to explain why the analysis was not in accordance with the Solicitation.

With respect to the evaluation of Northeast, the Historical Deli Sales Spreadsheet provides that the total Deli Net Sales at the Great Lakes Commissary from March 2009 through February 2010 was $706,228.12. See AR Tab 3, at 104-05. The CO included the Deli Net Sales at the Great Lakes Commissary from March 2009 through February 2010 in the Price Spreadsheet at Column B, Row 40. See AR Tab 11, at 2658.3. In accordance with the Solicitation, the CO multiplied $706,228.12 by .80 to arrive at $564,982.50. See AR Tab 2, at 29 ("Historical deli sales cited in the solicitation for the applicable cluster x 80% . . . ."); see also AR Tab 11, at 2658.3. The CO included the product of $706,228.12 and .80, $564,982.50, in the Price Spreadsheet at Column C, Row 40. See AR Tab 11, at 2658.3. The value found at Column D, Row 40, of the Price Spreadsheet is Northeast's proposed percentage of patron savings, [***]. See AR Tab 11, at 2658.3. Rather than multiplying $564,982.50, the product of $706,228.12 and .80, by [***] to arrive at an "evaluated price" of [***], as required by the Solicitation, see AR Tab 2, at 29 ("Historical deli sales cited in the solicitation for the applicable cluster x 80% x offeror's proposed percentage of savings for the given period . . . ."), the CO divided the value found at Column C, [***], by the result of 1 minus the value found at Column D ([***]), to arrive at [***], see AR Tab 11, at 2658.3. The CO included the value [***] at Column E, Row 40, of the Price Spreadsheet. See AR Tab 11, at 2658.3. The CO then subtracted the value found at Column C, [***], from the value found at Column E, [***], to arrive at Northeast's "Projected Savings–Core Items (Year 1)" of [***], found at Column F, Row 40, of the Price Spreadsheet. See AR Tab 11, at 2658.3.

Similarly, with respect to the evaluation of Nayyarsons, the Historical Deli Sales Spreadsheet provides that the total Deli Net Sales at the Great Lakes Commissary from March 2009 through February 2010 was $706,228.12. See AR Tab 3, at 104-05. The CO included

the Deli Net Sales at the Great Lakes Commissary from March 2009 through February 2010 in the Price Spreadsheet at Column B, Row 23.  See AR Tab 11, at 2658.3.  In accordance with the Solicitation, the CO multiplied $706,228.12 by .80 to arrive at $564,982.50.  See AR Tab 2, at 29 ("Historical deli sales cited in the solicitation for the applicable cluster x 80% . . . ."); see also AR Tab 11, at 2658.3.  The CO included the product of $706,228.12 and .80, $564,982.50, in the Price Spreadsheet at Column C, Row 23.  See AR Tab 11, at 2658.3.  The value found at Column D, Row 23, of the Price Spreadsheet is Nayyarsons's proposed percentage of patron savings, [***].  See AR Tab 11, at 2658.3.  Rather than multiplying $564,982.50, the product of $706,228.12 and .80, by [***] to arrive at an "evaluated price" of [***], as required by the Solicitation, see AR Tab 2, at 29 ("Historical deli sales cited in the solicitation for the applicable cluster x 80% x offeror's proposed percentage of savings for the given period . . . ."), the CO divided the value found at Column C, [***], by the result of 1 minus the value found at Column D ([***]), to arrive at [***].  See AR Tab 11, at 2658.3.  The CO included the value [***] at Column E, Row 23, of the Price Spreadsheet.  See AR Tab 11, at 2658.3.  The CO then subtracted the value found at Column C, [***], from the value found at Column E, [***], to arrive at Nayysarsons's "Projected Savings–Core Items (Year 1)" of [***], found at Column F, Row 23, of the Price Spreadsheet.  See AR Tab 11, at 2658.3.

Even though the CO did not calculate "evaluated price" in accordance with the Solicitation, the error did not prejudice plaintiff.  Nayyarsons's "evaluated price" for the Great Lakes Commissary in year 1 is [***], and Northeast's "evaluated price" for the Great Lakes Commissary in year 1 is [***].  In other words, based on the offerors' proposed percentage of patron savings, Nayyarsons will save patrons at the Great Lakes Commissary [***] in year 1.  Because Nayyarsons proposed [***] patron savings and Northeast proposed [***] patron savings [***], Nayyarsons's aggregated "evaluated price" (the total patron savings in dollars [***]), if done in accordance with the Solicitation, see AR Tab 2, at 29 ("Historical deli sales cited in the solicitation for the applicable cluster x 80% . . . ."), is necessarily more favorable to the government.  Accordingly, plaintiff cannot demonstrate "that there was a 'substantial chance' it would have been awarded the contract but for" DeCA's error.  See Weeks Marine, 79 Fed. Cl. at 35 (quoting Bannum, 404 F.3d at 1353).

Plaintiff also argues that DeCA did not document its "evaluated price" analysis.  Pl.'s Mot. 24.  Defendant argues that DeCA rationally documented its evaluation of price proposals.  Def.'s Resp. 32.  DeCA documented its "evaluated price" analysis in the Price Spreadsheet.  See AR Tab 11, at 2653, 2658.3-.5.  It cannot be said that DeCA's documentation of its "evaluated price" analysis in the Price Spreadsheet lacked a rational basis.  See Impresa, 238 F.3d at 1332.

Plaintiff also contends that "DeCA [a]rbitrarily and [c]apriciously [f]ailed to [e]valuate [p]rice [r]ealism." Pl.'s Mot. 25. The Solicitation does not describe the methodology required to conduct the price realism analysis. See AR Tab 2, at 29. Accordingly, DeCA "enjoy[s] broad discretion in conducting its price realism analysis." <u>DMS All-Star Joint Venture v. United States</u>, 90 Fed. Cl. 653, 665 (2010) (stating that when the solicitation "is silent as to the precise methodology of the price realism analysis contemplated by the [agency], the [agency] enjoy[s] broad discretion in conducting its price realism analysis").

Based on an analysis of elements in Nayyarsons's proposal, the CO determined that Nayyarsons would be able to offer the greatest percentage of patron savings:

> Continued patron savings will be upheld by offering daily, weekly, monthly, and seasonal promotions. Other promotions may include promotions forthcoming by vendors or on quantity purchases and cooking classes. <u>The end result is that through monitoring product mix, price comparisons and offering specials, Nayyar Sons can offer to the patron the highest possible savings against the local market</u>.

AR Tab 11, at 2653-54 (emphasis added). The foregoing determination, based on relevant aspects of Nayyarsons's proposal that Nayyarsons "can offer . . . the highest possible savings" to the patron, AR Tab 11, at 2653-54, cannot be viewed as irrational. Because the Solicitation does not prescribe the precise methodology required to conduct the price realism analysis, and because the CO's statement confirms that DeCA did indeed conduct a price realism analysis, this court has no reason to disregard DeCA's determination that Nayyarsons proposed a realistic percentage of patron savings.

Even if the CO did not adequately document its price realism analysis, there is no evidence in the Administrative Record suggesting that Nayyarsons's proposed percentage of patron savings was unrealistic. Indeed, the other offerors in the competitive range proposed similar percentages of patron savings, ranging from 26.70% - 45%. See AR Tab 11, at 2658.3-.4. With respect to defendant's price realism analysis, plaintiff cannot demonstrate "that there was a 'substantial chance' it would have been awarded the contract but for" DeCA's error. See <u>Weeks Marine,</u> 79 Fed. Cl. at 35 (quoting <u>Bannum</u>, 404 F.3d at 1353).

E.     Permanent Injunctive Relief Not Warranted

To obtain a permanent injunction, a plaintiff must succeed on the merits and show by a preponderance of the evidence: "(1) that it will suffer irreparable harm if injunctive relief is not awarded; (2) that granting the relief serves the public interest; and (3) that the harm to be

suffered by it outweighs the harm to the Government and third parties." United Int'l Investigative Servs., 41 Fed. Cl. at 323 (citing FMC Corp., 3 F.3d at 427). Because plaintiff has not succeeded on the merits of its case, it is unnecessary for the court to determine whether Northeast has established the remaining three factors.

IV.    Conclusion

        For the foregoing reasons, the court DENIES plaintiff's Motion and GRANTS defendant's Motion. The Clerk of Court is directed to ENTER JUDGMENT in favor of defendant. No costs.


        IT IS SO ORDERED.

                                              s/ Emily C. Hewitt
                                              EMILY C. HEWITT
                                              Chief Judge